UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

WILLIAM WELSH,                )
                                       )
      Plaintiff,           )
                                       )
      v.                  )      No.  4:14 CV 1283 JMB
                                       )
CAROLYN W. COLVIN,        )
Acting Commissioner of Social Security,     )
                                       )
      Defendant.      )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the Court, pursuant to the Social Security Act, 42 U.S.C. §§ 401, *et seq.*, authorizing judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff William Welsh's Application for Disability Insurance Benefits. Plaintiff has filed a Brief in Support of his Complaint, and the Commissioner has filed a Brief in Support of her Answer. The parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

## I.    Procedural History

On March 16, 2011, Plaintiff William Welsh filed an Application for Disability Insurance Benefits under Title II of the Act, 42 U.S.C. §§ 401 et. seq.  (Tr. 127-35)[1]  Plaintiff states that his disability began on March 27, 2009, as a result of fibromyalgia, carpal tunnel, herniated vertebrae, neuromyopothy, and back pain.  (Tr. 148)  On initial consideration, the Social Security Administration denied Plaintiff's claims for benefits.  (Tr. 80-84)  Plaintiff requested a

_____

[1]"Tr." refers to the page of the administrative record filed by the Defendant with her Answer (Docket No. 11/filed October 1, 2014).

hearing before an Administrative Law Judge ("ALJ").  On September 17, 2012, a hearing was held before an ALJ.  (Tr. 28-56)  Plaintiff testified and was represented by counsel.  (Id.)  After the close of the hearing, the ALJ propounded vocational interrogatories to an impartial vocational expert, James Westman.  (Tr. 48-52, 125-26, 369-73)  Mr. Westman answered the interrogatories on October 15, 2012.  Mr. Westman expressed the opinion that Plaintiff can perform sedentary work.  (Tr. 375-78)  Thereafter, on December 21, 2012, the ALJ issued a decision denying Plaintiff's claims for benefits.  (Tr. 7-27)  The Appeals Council found no basis for changing the ALJ's decision and denied his request for review on May 22, 2014.  (Tr. 1-4)  The ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.     Evidence Before the ALJ

### A.     Forms Completed by Plaintiff

In his Function Report - Adult, Plaintiff reported his daily activities include doing the dishes and the laundry.  (Tr. 164)  Plaintiff helps with the grocery shopping, but he noted he can only shop for one to two hours.  (Tr. 165)  Plaintiff reported that he spends two to three days a week in bed, and if he does something, he has to lie down for two to three hours.  (Tr. 162)  After walking fifty yards, Plaintiff indicated that he would need to rest two to three hours.  (Tr. 167)  Plaintiff reported being prescribed a cane in July 2010.  (Tr. 168)

In his Disability Report - Appeal, Plaintiff did not allege any worsening or new impairments since he filed his last completed disability report.  (Tr. 178)

### B.     Hearing on September 17, 2012

#### 1.     Plaintiff's Testimony

At the hearing on September 17, 2012, Plaintiff testified in response to questions posed by the ALJ and counsel. (Tr. 30-56) Plaintiff's wife works as a school teacher. (Tr. 33) Plaintiff served in the Navy as a hospital corpsman and received an honorable discharge. (Tr. 34)

Plaintiff last worked in 2008 or 2009 at Briden Flooring Company as a floor installer. (Id.) As the company's owner, Plaintiff could work a couple of hours a day and then go home to rest in bed to alleviate the pain. (Tr. 38) Plaintiff had previously worked at Colonial Rug Company installing floors. (Tr. 42) Plaintiff explained that the flooring jobs required a worker to get down and bend at the waist, and required repetitive sitting and standing and repetitive bending and twisting. (Tr. 43) Another duty included preparing bids for the jobs, and Plaintiff used a calculator and a computer in the bidding process. Plaintiff testified that he could no longer perform such tasks because he has trouble with his memory. (Id.)

Plaintiff testified that he experiences pain in his mid to lower back, hips, and feet, and his medications make him drowsy and affect his ability to concentrate. (Tr. 41, 49) Plaintiff stated that Dr. Chen administers pain injections one to two times a month. (Tr. 49)

Plaintiff testified that he has problems with instructions, so he has to write everything down. (Tr. 44) Every day his wife writes down in a book what he is needs to do. (Id.)

Plaintiff testified that he can sit for fifteen to twenty minutes, but then he has to stand up and stretch to relieve the pain. (Tr. 44) Plaintiff can sit back down for another fifteen to twenty minute period and then he has to stretch again. (Tr. 45) After a while, Plaintiff has to lie down to alleviate the pain. Plaintiff testified that he can walk for twenty yards before he has to rest and stretch out his back. (Id.) Plaintiff testified that he cannot lift anything weighing more than a

couple of pounds without experiencing pain.  (Tr. 51)  Plaintiff indicated that he can touch his

toes and bend at the waist, but both cause him pain.  (Id.)  Plaintiff has to lie down for four hours

to relieve the pain.  (Tr. 52)

Plaintiff explained how pain prevents him from getting out of bed many days.  (Tr. 45)

Plaintiff cannot drive and is dependent upon others to transport him.  (Tr. 46)  Plaintiff testified

that he could not take a bus or cab to work because he cannot remember the directions or bus

routes.  (Id.)

On a typical day, Plaintiff wakes up around noon and waits for his wife to come home

from work to eat.  (Tr. 47)  Plaintiff does not do any household chores including the laundry.

Plaintiff testified that he spends most of the day sitting in an easy chair.  (Id.)

At the end of the hearing, the ALJ explained that his office would send out

interrogatories to a vocational expert for the expert to answer, and once he received the answers,

the ALJ would proffer the answers to Plaintiff's counsel.  (Tr. 54)

### 2.        Testimony of Vocational Expert

Vocational Expert, James Westman, answered the ALJ's interrogatories on October 15,

2012.  Mr. Westman expressed the opinion that Plaintiff can perform sedentary work.  (Tr. 389-

73)  Mr. Westman characterized Plaintiff's vocational background to include work experience as

a floor layer.  Mr. Westman found that Plaintiff could perform the full range of sedentary work

and could perform jobs such as a team assembler, a film inspector, and an office clerk/charge

account clerk.  (Id.)  After receiving the responses to the interrogatories, the ALJ proffered the

response but Plaintiff did not submit any further requests.  (Tr. 379-80)

### III.        Medical Records and Other Records

## A.    General History

The medical evidence in the record shows that Plaintiff has a history of fibromyalgia and back pain.  (Tr. 205-1403)  Although the Court has carefully considered all of the evidence in the administrative record in determining whether the Commissioner's adverse decision is supported by substantial evidence, only the medical records relevant to the ALJ's decision and the issues raised by Plaintiff on this appeal are discussed.

To obtain disability insurance benefits, Plaintiff must establish that he was disabled within the meaning of the Social Security Act not later than the date his insured status expired - December 31, 2013.  Pyland v. Apfel, 149 F.3d 873, 876 (8th Cir. 1998) ("In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status."); see also 42 U.S.C. §§ 416(I) and 423(c); 20 C.F.R. § 404.131.


## B.    A & A Pain Institute - Dr. Edwin Dunteman

On September 3, 2009, Plaintiff reported having mid back pain and Dr. Dunteman administered an epidural steroid injection as treatment.  (Tr. 519-20)  Plaintiff reported having low back pain on March 8, 2010.  (Tr. 585)  Dr. Dunteman evaluated Plaintiff's wide spread complaints of back pain and reviewed his medication regimen.  (Tr. 585-86)

An MRI on July 31, 2009, of Plaintiff's thoracic spine showed minimal degenerative disc disease, a small right paracentral herniated disc with slight cord compression at T5-6, and no spinal stenosis.  (Tr. 464)  An MRI on November 16, 2009, of Plaintiff's lumbar spine showed minimal levoscoliosis, minimal disc space narrowing at L5-S1 level, and no spondylolisthesis. (Tr. 479)

At the request of Dr. Dunteman, Vic Zuccarello, an occupational therapist, completed a functional capacity assessment on May 4, 2010, and found Plaintiff could function at the light level, lifting and carrying fifteen pounds, and pushing/pulling ninety pounds. (Tr. 566-84) During the assessment, Plaintiff reported doing some repairs on his rental properties as a daily activity, and walking on a treadmill as his exercise routine. Mr. Zuccarello noted Plaintiff to be over guarded during the examination, and his ability to complete the testing was inconsistent with someone complaining of near emergency medical care pain. (Tr. 575) In particular, Mr. Zuccarello noted that Plaintiff's pain level is out proportion with his test behavior because he continued testing despite complaining about very high pain at the 10/10 level. (Id.)

In a July 7, 2010, "To Whom it May Concern Letter" prepared for Plaintiff, Dr. Dunteman stated Plaintiff's initial encounter dated back to March 2009 when he started to treat Plaintiff's ongoing mid back pain and chest pain. (Tr. 1164) Dr. Dunteman concluded by noting that "this facility has not restricted his job requirements other than encouraging proper body mechanics and the continuation of a home exercise program." (Id.)

### C.      Performance Rehab - Dr. Ravi Yadava

Dr. Ravi Yadava treated Plaintiff on September 29 and October 6 and 26, 2009, for his mid thoracic pain. (Tr. 464-78) During a new patient consultation, Plaintiff reported working full time as a flooring installer and having received treatment including passive treatment. Plaintiff denied having any other medical comorbidities. Dr. Yadava diagnosis included slight cord compression, myofacial pain with trigger points, and probable cubital tunnel syndrome. As treatment, Dr. Yadava prescribed therapeutic exercise, medications, and imaging studies. On October 6, 2009, Plaintiff underwent a nerve conduction test, which showed moderate carpal

tunnel syndrome bilaterally, moderate Guyon's canal syndrome bilaterally, mild cubital tunnel syndrome in his left elbow, and moderate cubital tunnel syndrome. An MRI on October 5, 2009, of his cervical spine showed mild spondylosis at C5-6 with a small left paracentral/foraminal disc herniation and mild spondylosis at C6-7. Plaintiff returned on October 6 and 26, 2009, and Dr. Yadava continued his treatment of therapeutic exercise and medications. (Id.)

In a December 6, 2009, Physical Therapy Progress Note, David Overby, a physical therapist, noted that Plaintiff had attended two therapy sessions and cancelled three other sessions. (Tr. 480) Mr. Overby noted that Plaintiff had decompensated mechanically within his pain complaints and his attitude. Plaintiff acknowledged that he had worked very little on the exercises, and he had consulted a disability attorney about filing for disability. (Id.) Mr. Overby noted that Plaintiff had felt better after having trigger point injections and beginning physical therapy exercises, Plaintiff explained that his symptoms returned once he stopped the exercises. (Tr. 481) Mr. Overby outlined a proposed course of treatment, including continuing physical therapy twice a week. (Id.)

### D. SSM St. Joseph Hospital Clinic - Dr. Karen Pentella

On December 29, 2009, Dr. Karen Pentella treated Plaintiff on referral by Dr. Wiewel for chronic pain and vitamin deficiency. (Tr. 559-63) In follow-up treatment on January 16, 2010, Plaintiff complained of severe back pain, and Dr. Pentella prescribed medications as treatment. (Tr. 549-58) Dr. Pentella noted Plaintiff returned for follow up regarding "fibromyalgia" on February 3, 2010, and listed fibromyalgia as a diagnosis. (Tr. 543-48) On March 19, 2010, Plaintiff reported that his symptoms remained unchanged, and Dr. Dunteman had recommended that he go on disability, and that he planned to file for disability inasmuch as

he could not return to his construction job. (Tr. 536-42) Dr. Pentella strongly encouraged Plaintiff to do increased aerobic exercise every day, noting even ten minutes twice a day would help. (Id.)


      **E.**      **St. Louis Medical Clinic - Drs. Ying Du and Humaira Naseer**

During an initial evaluation for pain on August 6, 2010, by Dr. Ying Du, a rheumatologist, Plaintiff reported having constant pain in his back, chest, knees, and ankles, and the pain increasing with activity since December 2008. (Tr. 206) Plaintiff reported having been diagnosed with fibromyalgia by a neurologist on March 20, 2010. (Tr. 207/436) Plaintiff reported improvement in his pain level after taking Lyrica for two months, and being able to stop taking a "pain cocktail" and narcotics after starting Lyrica. (Id.) Plaintiff stated that he was self employed and working in construction. (Tr. 208/437) Musculoskeletal examination revealed trigger points of the anterior chest wall, right trapezius, scapular, left lumbar, and left elbow. (Id.) Dr. Du noted Plaintiff's fibromyalgia symptoms had improved since starting Lyrica and he continued Plaintiff's medication regimen. (Tr. 209/438) In follow-up treatment on September 3, 2010, Plaintiff noted continuing pain in his back and hips. (Tr. 210/439). Plaintiff reported that, during the application process for the state trooper academy, he had to run one and one half miles which caused him to develop right knee pain. (Id.) Dr. Du found his fibromyalgia to be better, continued his medication regimen, and directed Plaintiff to take Ibuprofen and Tylenol as needed. (Tr. 211/440)

In a September 16, 2010, "To Whom it May Concern Letter" prepared for Plaintiff, Dr. Du stated Plaintiff has been under his care since August, 2010, and "[h]e suffers from

fibromyalgia, a condition that causes diffuse pain, fatigue and muscle stiffness. He has been taking several prescription medicines. He also does exercises at home. He still has significant pain in the back and the hips." (Tr. 205-06/441) Dr. Du further noted that Plaintiff has to change positions frequently "to get comfortable." Dr. Du also opined that "[t]his condition has caused him to be unable to sustain any gainful employment and is likely to keep him from being able to sustain any gainful employment for at least the next year or even longer." (Id.)

On November 5, 2010, Plaintiff reported having a fibromyalgia flare up and hurting everywhere. (Tr. 212/442) Dr. Du noted trigger points after completing a musculoskeletal examination, and prescribed Tramadol three times a day. (Tr. 213/443) In follow-up treatment on December 17, 2010, Dr. Du noted Plaintiff had trigger points except in his knees and elbows. (Tr. 214/444) Dr. Du prescribed Topamax and Percocet. (Tr. 215/445) In a January 10, 2011, letter, Dr. Du outlined lab results showing Plaintiff's cholesterol was mildly elevated and encouraged him to watch his diet and to exercise. (Tr. 218) During treatment on January 21, 2011, Plaintiff reported he developed "lots of pain" after fixing a broken water pipe. (Tr. 216/446) Examination showed trigger points with no synovitis. (Tr. 217/447) Dr. Du increased Plaintiff's Percocet dosage and prescribed Baclofen. (Id.)

Plaintiff returned for treatment on February 22, 2011, and complained of pain in his fingers, wrists, elbows, knees and left ankle for three weeks. (Tr. 221/448) Dr. Du noted that examination showed pain with range of motion testing and changed Plaintiff's medication to Savella. (Tr. 222/449) Dr. Du noted Plaintiff had trigger points except in his lumbar area during treatment on March 21, 2011, and restarted Plaintiff on Lyrica and Topamax and made a referral to a pain specialist. (Tr. 223-24/450-51) Plaintiff returned on March 29, 2011, and complained

- 9 -

of severe pain all over his body, and that his medications were not helping.  (Tr. 225/452)

Plaintiff reported that he had worked on a water heater the day before, and he had not scheduled

an appointment to see the pain specialist.  Dr. Du's examination showed trigger points, and he

prescribed Oxycontin.  (Tr. 226/453)

In treatment on July 5, 2011, Plaintiff reported working in construction and having filed

for disability.  (Tr. 227-28/714-15)  Examination showed positive trigger points.  (Tr. 228)

On August 18, 2011, Plaintiff received fibromyalgia follow-up treatment and reported his

memory problems began after he started taking Oxycontin.  (Tr. 240/734)  In the assessment, Dr.

Du noted that Plaintiff's memory loss was likely related to the pain medications and advised

Plaintiff to notify the prescribing doctors.  (Tr. 241)  Dr. Du instructed Plaintiff to exercise

regularly.  (Id.)

Dr. Humaira Naseer also treated Plaintiff after he hit his head on July 5, 2011.  (Tr.

231/729)  Plaintiff's wife noted she found him on the floor, and that Plaintiff did not recognize

the house or his daughter.  (Id.)   Plaintiff reported being fatigued and confused and having

difficulty with his memory and balance, and he denied any joint pain, muscle pain, or difficulty

sleeping.  (Tr. 236-37)   Dr. Naseer's examination showed no joint or limb tenderness to

palpitation. Plaintiff's memory and immediate recall were intact but he was unable to recall

current events.  (Tr. 238)  Dr. Naseer's mental examination on September 29, 2011, showed

Plaintiff's memory to be intact.  (Tr. 245)

During treatment on February 9, 2012, Plaintiff requested an increased dosage of Xanax

after having run out of Xanax, and his chief complaints were depression and anxiety.  (Tr. 251).

Dr. Du prescribed Xanax and instructed Plaintiff to exercise regularly.  (Tr. 252)

### F.    Greater St. Louis Pain Management - Dr. Tzer-Hwa Chen

On April 25, 2011, Dr. Chen evaluated Plaintiff for intractable chest pain at the Pain

Management Clinic on referral by Dr. Du.  (Tr. 346-48/607-09/661-63)   Plaintiff reported that

he had been experiencing constant chest pain since 2008 after an episode of pneumonia and back

pain.  Although Dr. Dunteman had treated Plaintiff in the past, Plaintiff stated that he had not

seen Dr. Dunteman since October 2010.  Plaintiff complained of leg cramps and back pain, he

also indicated that he had no joint pain, stiffness, myalgia, or muscle weakness.  Dr. Chen listed

chest wall pain and fibromyalgia in his clinical impression and increased Plaintiff's dosage of

Oxycontin and administered a thoracic sympathetic nerve blockade.  (Id.)

### G.    Allied Behavioral Consultants - Dr. Frederick Hicks

Between March 21 and July 31, 2012, Dr. Frederick Hicks treated Plaintiff's ongoing

memory impairment.  (Tr. 254-65)  On March 21, 2012, Plaintiff reported to Dr. Hicks that he

had been "working with an attorney about disability."  (Tr. 254)  Plaintiff stopped working in

December 2008 when he shut down his flooring company.  Plaintiff listed walking as his

recreation and stretching as his form of exercise.  Dr. Hicks diagnosed Plaintiff with cognitive

disorder, mood disorder due to medical conditions, and obsessive compulsive disorder.  Dr.

Hicks assigned a Global Assessment of Functioning (GAF) score of 55/65.[2]  (Id.)

---

[2] The Global Assessment of Functioning Scale ("GAF") is a psychological assessment tool
wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a
hypothetical continuum of mental health-illness"; it does "not include impairment in functioning
due to physical (or environmental) limitations."  *Diagnostic and Statistical Manual of Mental
Disorders* ("DSM-IV"), 32 (4th ed. 1994). A GAF score considers "psychological, social, and
occupational functioning on a hypothetical continuum of mental health/illness."  Id. at Text
Revision 34 (4th ed. 2000) (DSM-IV-TR). A GAF score between 51 and 60 indicates moderate
symptoms (*e.g.,* flat affect and circumstantial speech, occasional panic attacks), or moderate
difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or
co-workers).  A GAF score between 61 and 70 indicates some mild symptoms (*e.g.*, depressed

In a March 28, 2012, letter, Dr. Hicks noted that Plaintiff had been hospitalized at Mercy Hospital from March 22 through 27, 2012, for medication adjustments. (Tr. 1403) Plaintiff reported improvement with his anxiety, confusion, and pain. Dr. Hicks noted that Plaintiff's family was encouraged to "take a more active role in managing and supervising his medication as well as his activities." (Id.)

In follow-up treatment on April 4, 2012, after his hospitalization for medication adjustment, Plaintiff reported that he was pleased with his improved concentration and focus, and that he was more energetic and able to do some laundry and household tasks. (Tr. 258/960) Dr. Hicks diagnosed Plaintiff with mood disorder due to medical conditions and obsessive-compulsive disorder and noted his strengths include good general health. (Id.)

In follow-up treatment on June 29, 2012, Plaintiff reported having some trouble with his memory and being anxious "with ongoing thoughts about his finances." (Tr. 262/1392)

### H.     Missouri Baptist Hospital - Dr. Dave Rengachary

On referral by Dr. Du , Dr. Rengachary treated Plaintiff in consultation for episodic altered level of consciousness. (Tr. 269) An MRI on August 10, 2011, of Plaintiff's brain showed unremarkable results. (Tr. 273) An EEG showed a normal brain with an "episode of rigidness, eye opening and leg twitching without electroencephalographic changes." (Tr. 274) On August 11, 2011, Dr. Rengachary evaluated Plaintiff for his episodic altered level of consciousness, a new set of symptoms occurring over the last two weeks. (Tr. 269) Dr. Rengachary opined that this episode was not associated with any EEG changes and therefore was

---

mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships.

consistent with a nonepileptic event.  (Tr. 275)  Dr. Rengachary "discussed that according to Missouri State Law, he needs to follow event precautions to include no driving, ..., no heavy machinery, ... , no ladders, or open machinery."  (Tr. 270)

### I.      St. Charles Clinic - Dr. Chandra Wiewel

Between November 10, 2009, through July 26, 2010, Dr. Chandra Wiewel treated Plaintiff as his primary care physician.  (Tr. 389-430)  Plaintiff presented for a physical on December 2, 2009, and requested medication refills.  (Tr. 400)  After lab work showed Plaintiff had high cholesterol, Dr. Wiewel made a diagnosis of dyslipidemia.  (Tr. 397)  Plaintiff reported that a neurology consultation had been scheduled with Dr. Pentella during treatment on December 14, 2009.  (Tr. 504)  Dr. Wiewel observed that Plaintiff did not appear to be in the 9/10 pain level as suggested and opined that "patient remains complex because we find minimal pathology that would explain his symptoms.  We have concerns over symptom magnification, especially since he started discussing the need for disability.  We do not feel that he is disabled." (Tr. 504-05)  After reviewing an x-ray of Plaintiff's back, Dr. Wiewel noted that Plaintiff's reported levels of pain do not correlate with the imaging findings.  (Tr. 505)

On May 26, 2010, Plaintiff reported that while working in his yard, he became lightheaded.  (Tr. 392)  During treatment on July 26, 2010, Plaintiff noted that he had received treatment with a pain management doctor, Dr. Dunteman, but he stopped seeing Dr. Dunteman when the doctor would not support his seeking disability.  (Tr. 389)  Dr. Wiewel agree to refill Plaintiff's medications until he could schedule treatment with a specialist.  (Tr. 390, 393)

### J.      Missouri Baptist Medical Center Treatment Notes

On December 28, 2008, Plaintiff presented at Missouri Baptist complaining of chronic, intermittent, atypical chest pain and requested IV narcotics specifically. (Tr. 1101) Plaintiff reported having taken some type of pain medication since being discharged earlier in the month for treatment of pleuritic chest pain. (Tr. 1115) Dr. Stacie Stanfield noted that some of Plaintiff's pain behavior was not consistent with his reports of pain and opined this was "certainly concerning for a possible behavior component, such as drug seeking." (Tr. 1101) A stress echo that showed normal results . (Tr. 1106) Dr. Stanfield discharged Plaintiff with a limited supply of Tylenol #3. (Tr. 1101)

On December 27, 2011, Plaintiff presented in the emergency room after having been assaulted by his son who allegedly hit him in the left side of his head. (Tr.748) Plaintiff lost consciousness and experienced a seizure. Plaintiff reported having chronic pain problems to his mid back area, a headache, and a history of seizures. (Id.) Plaintiff's stresses in life included financial stressors, his inability to work for two years secondary to fibromyalgia and family stressors including a poor relationship with his son. (Tr. 754) A CT scan of Plaintiff's cervical spine showed mild degenerative change but no acute abnormality. (Tr. 760, 809) Plaintiff was admitted, treated with Dilantin, Keppra, and Cerebryx, and received a neuropsychology consultation. (Tr. 766, 769) During treatment, Plaintiff reported experiencing two years of severe fibromyalgia and generalized weakness, having filed for disability, and taking Oxycontin and Tizanidine for pain. (Tr. 811) Plaintiff's medication regimen was adjusted. (Tr. 812)

## IV.    The ALJ's Decision

The ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. (Tr. 12) Plaintiff has not engaged in substantial gainful

activity since March 27, 2009, his alleged onset date.  The ALJ found Plaintiff has the severe

impairments of fibromyalgia, and mild degenerative discogenic neck and back, but no

impairment or combination of impairments listed in, or medically equal to one listed in

Appendix 1, Subpart P, Regulations No. 4.  (Tr. 12-16)  The ALJ found that Plaintiff has the

residual functional capacity to perform sedentary work except he is able to understand,

remember, and carry out simple instructions.  (Tr. 16)  The ALJ found Plaintiff is unable to

perform any past relevant work.  (Tr. 19)  The ALJ noted that Plaintiff was born on May 27,

1972, and was thirty-six years old on the alleged disability onset date, and thus is defined as a

younger individual age 18-44.  Plaintiff has at least a high school education and is able to

communicate in English.  The ALJ found that, considering Plaintiff's age, education, work

experience, and residual functional capacity, there are jobs existing in significant numbers in the

national economy he could perform including a team assembler/final assembler, a film inspector,

and an office clerk/charge account clerk.  (Tr. 20)  The ALJ concluded Plaintiff has not been

disabled within the meaning of the Social Security Act at any time from March 27, 2009,

through the date of the decision.  (Tr. 20)

## V.    Discussion

    In a  disability insurance benefits case, the burden is on the claimant to prove that he or

she has a disability.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Under the

Social Security Act, a disability is defined as the "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  Additionally, the

claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If he is, then he is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If he is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, he is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which she must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, he is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other

work in the national economy will he be found disabled.  20 C.F.R. § 404.1520(f); see also

Bowen, 482 U.S. at 140-41 (explaining five-step process).

The Court's review of an ALJ's disability determination is narrow; the ALJ's findings

will be affirmed if they are supported by "substantial evidence on the record as a whole."

Pearsall, 274 F.3d at 1217.  Substantial evidence has been defined as "less than a preponderance,

but enough that a reasonable mind might accept it as adequate to support a decision."  Id.  The

court's review "is more than an examination of the record for the existence of substantial

evidence in support of the Commissioner's decision, we also take into account whatever in the

record fairly detracts from that decision."  Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir.

1998).  The Court will affirm the Commissioner's decision as long as there is substantial

evidence in the record to support his findings, regardless of whether substantial evidence exists

to support a different conclusion.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire

administrative record and consider:

1.      The credibility findings made by the ALJ.

2.      The claimant's vocational factors.

3.      The medical evidence from treating and consulting physicians.

4.      The claimant's subjective complaints relating to exertional and non-
        exertional activities and impairments.

5.      Any corroboration by third parties of the claimant's impairments.

6.      The testimony of vocational experts when required which is based upon
        a proper hypothetical question which sets forth the claimant's impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

<u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

Plaintiff argues that the Court should remand the case inasmuch as the ALJ allegedly incorrectly applied SSR 12-2p regarding whether Plaintiff's fibromyalgia did in fact equal another listing. Plaintiff also contends that the ALJ erred in weighing the opinions of treating physician, Dr. Ying Du. For the following reasons, the Court finds Plaintiff's arguments are without merit and that the ALJ's decision is based on substantial evidence.

**A.      Plaintiff's Credibility**

The Court will first address the ALJ's adverse credibility determination. Although Plaintiff has not raised a specific challenge in this regard, the evaluation of Plaintiff's credibility is necessary to a full consideration of the ALJ's determinations, including the RFC assessment and the severity of his alleged impairments. <u>See</u> <u>Wildman v. Astrue</u>, 596 F.3d 959, 969 (8th Cir. 2010) (explaining that an "ALJ's determination regarding [a claimant's] RFC was influenced by [the ALJ's] determination that [claimant's] allegations were not credible") (citing <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005)). Moreover, the Eighth Circuit has instructed that, in the course of making an RFC determination, the ALJ is to consider the credibility of a claimant's subjective complaints in light of the factors set forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984). <u>See also</u> 20 C.F.R. §§ 404.1529, 416.929. The factors identified in <u>Polaski</u> include: a claimant's daily activities; the location, duration, frequency, and intensity of his symptoms; any precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of his medication; treatment and measures other than medication he has received; and any other factors concerning his impairment-related limitations. <u>See</u> <u>Polaski</u>, 739 F.2d at 1322; 20 C.F.R. §§ 404.1529, 416.929. An ALJ is not, however, required to discuss each

<u>Polaski</u> factor and how it relates to a claimant's credibility.  <u>See</u> <u>Partee v. Astrue</u>, 638 F.3d 869,

865 (8th Cir. 2011) (stating that "[t]he ALJ is not required to discuss methodically each <u>Polaski</u>

consideration, so long as he acknowledged and examined those considerations before

discounting a [plaintiff's] subjective complaints") (internal quotation and citation omitted);

<u>Samons v. Astrue</u>, 497 F.3d 813, 820 (8th Cir. 2007) (stating that "we have not required the

ALJ's decision to include a discussion of how every <u>Polaski</u> factor relates to the [plaintiff's]

credibility).

     This Court reviews the ALJ's credibility determination with deference and may not

substitute its own judgment for that of the ALJ.  <u>See</u> <u>Gregg v. Barnhart</u>, 354 F.3d 710, 713 (8th

Cir. 2003) (holding that "[i]f an ALJ explicitly discredits the [plaintiff's] testimony and gives

good reasons for doing so, [the reviewing court] will normally defer to the ALJ's credibility

determination"); <u>Pearsall</u>, 274 F. 3d at 1218.

     In this case, the ALJ concluded that Plaintiff's "statements concerning the intensity,

persistence and limiting effects of these symptoms [were] not credible to the extent they are

inconsistent with the [ALJ's RFC] assessment."  (Tr. 18)  This determination is important

because

Dr. Du's opinions, no doubt, relied in part on Plaintiff's subjective complaints.  (<u>Id.</u>)

     The ALJ gave sufficient reasons for his adverse credibility finding.  The ALJ supported

his adverse credibility determination with a review of numerous factors consistent with the

<u>Polaski</u> rubric.  Another proper consideration by the ALJ was Plaintiff's failure to follow his

doctor's treatment recommendations.  For example, Plaintiff discontinued medications without

permission, cancelled scheduled physical therapy sessions, and failed to schedule an

appointment with a pain specialist even though Dr. Du made a referral for such treatment.  See Dunahoo v. Apfel, 241 F.3d 1033, 1037 (8th Cir. 2001) (failure to follow prescribed course of treatment may be weighed against claimant's credibility when assessing subjective complaints). Similarly, the record suggests that Plaintiff's condition improved with compliance.

Plaintiff's activity level undermines his assertion of total disability.  Indeed, Plaintiff admitted that, among other things, he engages in regular work activity by doing repairs at his properties and working in his yard.  The ALJ noted that Plaintiff reported being able to care for his own personal needs, visit friends, help with grocery shopping, and walking on a treadmill as his exercise routine.  The ALJ opined that "the fact that the claimant reported fixing his own properties tends to show that the evaluator is correct as it reflects activities that are inconsistent with allegations of not being able to do anything but sit in a chair, watch television, and lift a few pounds."  (Tr. 18)  See, e.g., Robertson v. Astrue, 481 F.3d 1020, 1025 (8th Cir. 2007) (holding that substantial evidence supported ALJ's denial of disability benefits in part because claimant "engaged in extensive daily activities," including taking care of her child, driving a vehicle, preparing meals, performing housework, shopping for groceries, handling money, and visiting family).

During treatment, Plaintiff also reported applying for a job as a state trooper.  A Claimant's search for employment during a claimed period of disability is a factor the ALJ can properly consider in determining credibility.  See House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (holding that the claimant's looking for work was inconsistent with a claim of disability); Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006) (listing factors supporting ALJ's credibility finding); Goff, 421 F.3d at 792 ("Inconsistencies between [a claimant's] subjective

complaints and [his] activities diminishes [his] credibility); Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001); Bentley v. Shalala, 52 F.3d 784, 786 (8th Cir. 1995) ("[T]he record of contemplating work [including applying for jobs related to and unrelated to his previous work] indicates [the claimant] did not view his pain as disabling.").

Additionally, "[a]n ALJ may discount a claimant's subjective complaints if there are inconsistencies in the record as a whole." Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008). See also McCoy v. Astrue, 648 F.3d 605, 614 (8th Cir. 2011) (inconsistencies in record detract from a claimant's credibility). For instance, Plaintiff reported being prescribed a cane, but the medical records do not support this assertion. See Kriebaum v. Astrue, 280 Fed.App'x 555, 559 (8th Cir. 2008) (finding ALJ's adverse credibility determination based on, inter alia, claimant's use of self-prescribed cane to be "supported by good reasons"). Likewise, Plaintiff testified he has to lie down for two to three hours to alleviate his pain after he does something. There is no objective medical evidence substantiating Plaintiff's need to lie down. The record does not reflect physician imposed restrictions thus Plaintiff's restrictions in daily activities are self-imposed rather than by medical necessity. See e.g., Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day).

Finally, like the ALJ, the undersigned notes that the medical records show that some medical care providers questioned possible symptom magnification, drug seeking behavior, or malingering by Plaintiff. "[A]n ALJ may discount a claimant's allegations if there is evidence that claimant was a malinger or was exaggerating symptoms for financial gain." Davidson v.

Astrue, 578 F.3d 838, 844 (8th Cir. 2009) (quoting O'Donnell v. Barnhart, 318 F.3d 811, 818 (8th Cir. 2003) (alteration in original).  For instance, one medical care provider noted that Plaintiff's ability to complete the testing was inconsistent with someone complaining of near emergency medical care pain.  Another provider observed that Plaintiff did not appear to be in the 9/10 pain level as suggested and opined that "patient remains complex because we find minimal pathology that would explain his symptoms.  We have concerns over symptom magnification, especially since he started discussing the need for disability.  We do not feel that he is disabled."  (Tr. 504-05)  Yet another provider noted that some of Plaintiff's pain behavior was not consistent with his reports of pain and opined this was "certainly concerning for a possible behavior component, such as drug seeking."  Although Plaintiff reported that Dr. Dunteman had recommended that he go on disability during treatment on March 19, 2010, Dr. Dunteman's treatment notes do not support this assertion.

In review the record in this case, therefore, the Court is satisfied that the ALJ complied with the standards outlined in Polaski and did not err in finding Plaintiff's subjective allegations less than credible.

**B.    SSR 12-2p**

Plaintiff argues that the Court should remand the case inasmuch as the ALJ incorrectly applied SSR 12-2p.  In particular, Plaintiff acknowledges that the ALJ considered SSR 12-2p in finding that his fibromyalgia was a severe impairment, but he argues that the ALJ "did not properly weigh the evidence in the determination of the RFC as she failed to consider whether any of Plaintiff's numerous fibromyalgia signs or co-occurring conditions equaled a listing.  It is important to note that Plaintiff's records indicate that Plaintiff suffered from nearly all of the

conditions, with the exception[*sic*] of irritable bowel syndrome."

Fibromyalgia, a chronic condition recognized by the American College of Rheumatology ("ACR"), is inflammation of the fibrous and connective tissue, causing long-term but variable levels of muscle and joint pain, stiffness, tenderness, and fatigue. See Jeffrey Larson, Fibromyalgia, in 2 The Gale Encyclopedia of Medicine, 1326-27 (Jacqueline L. Longe et al. eds, 2d ed. 2002). Fibromyalgia is diagnosed based on a history of at least three months of widespread pain with tenderness in at least eleven of the eighteen tender-point sites known as trigger points. Id. Treatments include massage, trigger-point injections, proper rest and diet, physical therapy, patient education, and medication such as muscle relaxants, antidepressants, and anti-inflammatory pain medications. Id.

Section II.B of SSR 12-2P provides guidance on how to establish whether a person has a medically determinable impairment of fibromyalgia, and the criteria to be considered for evaluating the existence of fibromyalgia as a medically determinable impairment as follows:

B.... [W]e may find that a person has a [medically determinable impairment] of [fibromyalgia] if he or she has all three of the following criteria:

1. A history of widespread pain[3]...;

2. Repeated manifestations of six or more [fibromyalgia] symptoms, signs, or co-occurring conditions, especially manifestations of fatigue, cognitive or memory problems ("fibro fog"), waking unrefreshed, depression, anxiety disorder, or irritable bowel syndrome; and

3. Evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded....

---

[3]This is defined as "pain in all quadrants of the body (the right and left sides of the body, both above and below the waist) and axial skeletal pain (the cervical spine, anterior chest, thoracic spine, or low back) - that has persisted (or that persisted) for at least 3 months," but which "may fluctuate in intensity and may not always be present." Id.

Id. at *3 (internal footnotes omitted).[4] SSR 12-2P specifically states that fibromyalgia "cannot meet a listing in appendix 1 because [fibromyalgia] is not a listed impairment." Thus, noting there is no specific listing for fibromyalgia, the undersigned is to consider whether Plaintiff's fibromyalgia "equals a listing."

An impairment is medically equivalent to a listing under the regulations if it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. § 416.926(a). The claimant bears the burden of proving that his impairment meets or equals a listing. See Carlson v. Astrue, 604 F.3d 589, 593 (8th Cir. 2010). "To meet a listing, an impairment must meet all of the listing's specified criteria." Id. (quoting Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004)). An impairment that only meets some criteria does not qualify, no matter how severe the impairment. Johnson, 390 F.3d at 1070. While Plaintiff takes issue with the ALJ's analysis, Plaintiff has failed to explain to this Court how he has either met the listing or shown a medical equivalent. Because Plaintiff has not shown that the ALJ's analysis was flawed, and the Court finds that the ALJ's decision is supported by substantial evidence.

The undersigned first notes that the ALJ found that Plaintiff "does not have an impairment or combination or impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1." (Tr. 15). Under 20 C.F.R. 404. 1526(a), an impairment is medically equivalent to a listed impairment if "it is at least equal in severity and duration to the criteria of any listed impairment." Noting she considered SSR 12-2p, the ALJ found the severity of the criteria are not established under Listings 1.02 and 1.04.

---

[4]The undersigned notes that Plaintiff does not argue the Section II.A criteria are satisfied. A review of the medical record before the ALJ does not support a conclusion that they were satisfied inasmuch as the record contains no clear evidence of a diagnosis of fibromyalgia based on "[a]t least 11 positive tender points on physical examination." Id. at *2.

The ALJ acknowledged that Plaintiff had been diagnosed with fibromyalgia and the medical record established evidence of trigger point signs and pain to find Plaintiff's fibromyalgia to be a medically determinable impairment but she concluded Plaintiff's fibromyalgia did not meet or equal the severity requirements of Sections 1.02 and 1.04 of the Listing of Impairments.

Listing 1.02 is for the "[m]ajor dysfunction of a joint(s) (due to any cause)." 20 C.F.R. Pt. 404 Subpt. P, Appx. 1, Section 1.02. "Major joints refers to the major peripheral joints, which are the hip, knee, shoulder, elbow, wrist-hand, and ankle-foot, as opposed to other peripheral joints (e.g., the joints of the hand or forefoot) or axial joints (i.e., the joint of the spine)." 20 C.F.R. Pt. 404, Subpt. P., Appx. 1, Section 1.00(F). Although Plaintiff argued before the ALJ that he suffers from pain in the low back, hips, feet, and ankles, testing did not show any other inflammatory response such as arthritis or Sjogren's antibody, a rheumatic disease, and a review of the medical record fails to show objective medical evidence supporting his claims. The ALJ also noted that physical examinations of record do not reveal manipulative functions consistent with the severity of the listing.

All of this evidence supports the ALJ's conclusion that Claimant did not meet or medically equal the criteria of Listing 1.02, and the ALJ's failure to discuss her reasoning in detail is not reversible error, as long as the conclusion is supported by the record. Boettcher v. Astrue, 652 F.3d 860, 863 (8th Cir. 2011) ("There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record.").

Likewise, the undersigned notes that the record showed Plaintiff engaged in activities inconsistent with his claimed limitations Plaintiff reported such as working at his rental

properties, fixing a water pipe, working on a water heater, running one and half miles as part of an application process with the state trooper academy, and working in construction after the alleged onset date. Accordingly, the objective medical evidence fails support Plaintiff's claim.

Listing 1.04 is for "[d]isorders of the spine (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, ostearthritis, degenerative disc disease, facet arthritis, vertebral fracture) resulting in compromise of a nerve root ... or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 1.04. The disorder must include (A) "[e]vidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy associated with muscle weakness or muscle weakness) accompanied by sensory or reflex loss and if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);" or (B) "[s]pinal arachnoiditis"; or (C) "[l]umbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively...." Id. The ALJ noted that the diagnostic testing showed mild thoracic spine degeneration and disc disease involving a small-herniated disc, minimal disc space narrowing of the lumbar spine, mild disc bulging, and spondylosis of the neck. Further, the ALJ noted that the medical evidence of record does not show a neurological compromise or other conditions expected under the Listing. Likewise, the ALJ found that physical examinations showed Plaintiff able to ambulate, and tenderness of his spine with mild rotational restrictions of his neck, and the majority of the examinations showed Plaintiff to have good muscle tone and bulk, equal strength, and unremarkable neurological, reflex, and sensory examinations. The ALJ further opined that the medical record does not show Plaintiff to have ongoing difficulties with

his ability to physically ambulate.  Accordingly, the ALJ's conclusion that Plaintiff's impairment does not meet or medically equal the requirements of § 1.04 is supported by the record.  The record does not demonstrate the degree of impairment and restriction that would approach that contemplated by the listing.

The ALJ specifically found that Plaintiff did not met or equal Listings 11.02 and 11.04, and the undersigned finds Plaintiff has not met his burden of proving that he equaled the listings. Indeed, Plaintiff failed to specify which listing(s) his impairments met or equaled.  The ALJ found that Plaintiff did not meet the criteria for Listings 11.02 and 11.04, and the objective medical evidence supports this finding.  Accordingly, the undersigned finds that the ALJ did consider whether Plaintiff's fibromyalgia signs or co-occurring conditions equaled a listing, and the record as a whole supports the ALJ's determination.

## C.  **Treating Physician Dr. Ying Du**

Plaintiff also argues the ALJ erred in weighing the opinions of treating physician, Dr. Ying Du.  The Court finds no error in this case.

Opinions from medical sources who have treated a claimant typically receive more weight than opinions from one-time examiners or non-examining sources.  See 20 C.F.R. § 416.927(c)(1)-(2).  However, the rule is not absolute; a treating physician's opinion may be disregarded in favor of other opinions if it does not find support in the record.  See Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007).  Likewise, an ALJ may appropriately rely on non-examining opinions as part of the RFC analysis.  See Hacker v. Barnhart, 459 F.3d 935, 939 (8th Cir. 2006) (ALJ's RFC assessment was supported by substantial evidence, including the opinions from non-examining doctors).  Ultimately, it is up to the ALJ to determine the weight

that each medical opinion is due.  Id. at 936 (ALJ's task is to resolve conflicts in evidence).

"A treating physician's opinion is given controlling weight if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record." Tilley v. Astrue, 580 F.3d 675, 679 (8th Cir. 2009) (quoting 20 C.F.R. §404.1527(d)(2) (alteration in original)).  When a treating physician's opinions "are inconsistent or contrary to the medical evidence as a whole, they are entitled to less weight." Halverson v. Astrue, 600 F.3d 922, 930 (8th Cir. 2010).  "A treating physician's opinion does not automatically control, since the record must be evaluated as a whole." Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009).  Thus, "'an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record.'" Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (quoting Prosch v. Apfel, 201 F.3d 1010, 1013-14 (8th Cir. 2000)).  The ALJ is charged with the responsibility of resolving conflicts among the medical opinions. Finch v. Astrue, 547 F.3d 933, 936 (8th Cir. 2008).

Additionally, Social Security Ruling 96-2p states in its "Explanation of Terms" that it "is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record." 1996 WL 374188, at *2 (S.S.A. July 2, 1996).  SSR 96-2 clarifies that 20 C.F.R. §§ 404.1527 and 416.927 require the ALJ to provide "good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s)." Id. at *5.

The undersigned finds that the ALJ considered Dr. Du's letter dated September 16, 2010,

and gave some weight to his opinions in the written opinion as follows:

> The undersigned has considered the medical source statement by Dr. Du dated
> September 16, 2010. That statement essentially describes the symptoms of the
> claimant associated with his fibromyalgic condition which has been treated for
> a[*sic*] several months by Dr. Du. Dr. Du's statement is primarily based on
> reported symptoms. From this, he concludes that the claimant is not able to
> sustain gainful employment without indicated further objective findings. In
> addition, Dr. Du's statement reflects one very generally defined limitation of
> needing to change positions frequently to get comfortable. He does not specify
> what position he is referring to and for how long other that change needs to occur.
> Moreover, Dr. Du is imprecise in his estimation of the duration of such a
> limitation as he refers to at least one year or even longer and does not indicate the
> onset of the limitation. Finally, as discussed above, the record shows treatment
> by Dr. Du[..] involved injections and oxycontin treatment for less than one year.
> As a result, the statement is vague and ambiguous, lacks sufficient foundation, is
> conclusory in that it does not provide functional analysis but a conclusion of
> employability, and it is incomplete. However, the undersigned has considered the
> statement to the extent that it explains in summary fashion the underlying
> symptoms of the claimant and obviously does not limit the claimant to the extent
> alleged by the claimant in his testimony.

(Tr. 19)

First, to the extent Dr. Du opined that Plaintiff is disabled and incapable of performing

any competitive employment, a treating physician's opinion that a plaintiff is not able to work

"involves an issue reserved for the Commissioner and therefore is not the type of 'medical

opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988,

994 (8th Cir. 2005); House v. Astrue, 500 F.3d 741, 745 (8th Cir. 2007) (A physician's opinion

that a claimant is "disabled" or "unable to work" does not carry "any special significance,"

because it invades the province of the Commissioner to make the ultimate determination of

disability).

The ALJ acknowledged that Dr. Du was a treating source, but found that his opinions set

forth in the September16, 2010, letter were vague and ambiguous, lacking in sufficient

foundation, and conclusory.  An ALJ may properly discount a treating physician's opinion if it is conclusory.  See Wildman, 596 F.3d at 964 ("Indeed, '[a] treating physician's opinion deserves no greater respect than any other physician's opinion when [it] consists of nothing more than vague, conclusory statements.'") (quoting Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)).  The ALJ specifically noted that she considered the opinions to the extent they explained Plaintiff's underlying symptoms and do not limit Plaintiff to the extent he alleges in his testimony.  Opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data.  Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995); 20 C.F.R. § 404.1527(d)(3) (providing that more weight will be given to an opinion when a medical source presents relevant evidence, such as medical signs, in support of his or her opinion).

The record shows Dr. Du treated Plaintiff on eleven occasions from August 6, 2010, through February 9, 2012, but only on two occasions before writing the letter.  Dr. Du treated Plaintiff a couple of weeks before completing the letter, but Plaintiff did not report the conditions and symptoms that he claims render him totally disabled.  Plaintiff reported that his pain level had improved after starting Lyrca.  Although Plaintiff reported experiencing pain in his back and hips, he noted how he completed a mile and a half run as part of the application process as a state trooper.  During treatment on August 18, 2011, and February 9, 2012, Dr. Du instructed Plaintiff to exercise regularly.  It is significant that no examination notes accompanied Dr. Du's disability letter.

Dr. Du's opinions are inconsistent with his own clinical treatment notes.  "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the

physician's clinical treatment notes." Wildman, 596 F.3d at 964; see also Clevenger v. S.S.A., 567 F.3d 971, 975 (8th Cir. 2009) (affirming ALJ's decision not to follow opinion of treating physician that was not corroborated by treatment notes). Because Dr. Du's opinions are not supported by his treatment notes, the ALJ properly discounted those opinions. See Wildman, 596 F.3d at 964 (rejecting challenge to lack of weight given treating physician's opinion where the physician renders inconsistent opinions that undermine the credibility of such opinions); Hacker, 459 F.3d at 937 (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment). The ALJ correctly noted that Dr. Du's own treatment notes are inconsistent with Plaintiff's alleged exertional limitations. For example, Dr. Du (like other treating sources) encouraged Plaintiff to exercise, and he imposed no restrictions on Plaintiff's activities. Further, the letter appears to have been procured by, and submitted to, Plaintiff's counsel. The letter does not refer to any clinical tests or findings.

A review of Dr. Du's treatment notes also shows he never imposed any physical limitations or any work restrictions on Plaintiff. See Fischer v. Barnhart, 56 F. App'x 746, 748 (8th Cir. 2003) ("in discounting [the treating physician's] opinion, the ALJ properly noted that ... [the treating physician] had never recommended any work restrictions for [the claimant]"). Dr. Du's treatment notes do not reflect the degree of limitation he indicated in his September 16, 2010, letter. See Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011). The only physical limitation set forth in the letter was the need to change positions frequently to get comfortable, but Dr. Du did not explain with what frequency Plaintiff needed to change positions, nor did he identify the position to be changed. See Strongson v. Barnhart, 361 F.3d 1066, 1070 (8th Cir.

2004) (ALJ may appropriately disregard "vague, conclusory statements" by treating physician). The undersigned concludes that the ALJ did not err in affording any weight to Dr. Du's opinion regarding Plaintiff's need to change position.

Further, the Court has not found any other examining physician's treatment notes stating that Plaintiff was disabled or unable to work, or imposing mental limitations on his capacity for work. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000) (significant that no examining physician submitted medical conclusion that claimant is disabled or unable to work); Edwards v. Secretary of Health & Human Servs., 809 F.2d 506, 508 (8th Cir. 1987) (examining physician's failure to find disability a factor in discrediting subjective complaints). Mr. Zuccarello's functional capacity assessment on May 4, 2010, found Plaintiff could function at the light level, lifting and carrying fifteen pounds, pushing/pulling ninety pounds. This is consistent with Plaintiff's own reported activities. For example, Plaintiff reported doing some repairs on his rental properties as needed as a daily activity and walking on a treadmill as an exercise routine. Moreover, Mr. Zuccarello noted Plaintiff to be over guarded during the examination, and his ability to complete the testing was inconsistent with someone complaining of near emergency medical care pain. In a July 7, 2010, letter, Dr. Dunteman concluded by noting that "this facility has not restricted his job requirements other than encouraging proper body mechanics and the continuation of a home exercise program." During treatment, Dr. Pentella strongly encouraged Plaintiff to do increased aerobic exercise every day.

Thus, the ALJ did not err in giving only some weight to Dr. Du's opinions and gave sufficient reasons for discounting those opinions. The record supports the ALJ's conclusion that Dr. Du's opinions were inconsistent with, and unsupported by, other evidence in the record,

including Dr. Du's own treatment notes.   See Davidson v. Astrue, 578 F.3d 838, 842 (8th Cir.

2009) (ALJ may discount a treating physician's opinion if it is not supported by the doctor's own

treatment records); Reed v. Barnhart, 399 F.3d 917, 921 (8th Cir. 2005) (ALJ permitted to

discount medical source's opinions in MMS where limitations listed on the form stand alone and

were never mentioned in numerous treatment records nor supported by objective testing or

reasoning); Halverson, 600 F.3d at 930 (inconsistency between treating physician's treatment

records and his functional assessment provides good reason for ALJ to discount physician's

opinion).

        The fact that the ALJ's written decision does not identify the specific weight given to Dr.

Du's opinion does not necessitate remand in this case.  The record makes clear that the ALJ

considered the opinions of Dr. Du's letter of September 16, 2010, and gave those opinions some

weight, but less than controlling weight.  At best, Plaintiff has identified a deficiency in the ALJ's

opinion-writing technique, and not a substantive error in the ALJ's analysis or conclusions.  See

Dunbar v. Colvin, 2014 WL 319280, at *5 (E.D. Mo. 2014) (finding arguable deficiency in

opinion-writing technique is not a sufficient reason to set aside an administrative finding where

the deficiency has not practical effect on the outcome of the case  when the ALJ did not explicitly

provide the weight given to a doctor's opinion, because it was clear the ALJ gave some weight to

the opinion); cf Keyes-Zachary v. Astrue, 695 F.3d 1156, 1162-66 (10th Cir. 2012) (holding that

any error by the ALJ in failing to state what weight the ALJ assigned to each medical opinion was

harmless and noting mere technical omissions in the ALJ's do not dictate reversal).

        Having reviewed the record and the ALJ's reasoning, the undersigned finds the ALJ

provided sufficient rationale for giving less than substantial or controlling weight to Dr. Du's

opinions set forth in the September 16, 2010, letter.

**VI.     Conclusion**

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. An ALJ's decision is not to be disturbed "'so long as the ... decision falls within the available zone of choice.  An ALJ's decision is not outside the zone of choice simply because [the Court] might have reached a different conclusions had [the Court] been the initial finder of fact.'"  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quoting Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008)).  Although Plaintiff articulates why a different conclusion might have been reached, the ALJ's decision, and, therefore, the Commissioner's, was within the zone of choice and should not be reversed.  Accordingly, the decision of the ALJ denying Plaintiff's claims for benefits should be affirmed.

**IT IS HEREBY ORDERED** that the decision of the Commissioner be **AFFIRMED**.  A separate Judgment in accordance with this Memorandum and Order is entered this same date.


Dated this  19th  day of August, 2015.

                                        */s/ John M. Bodenhausen*
                                        JOHN M. BODENHAUSEN
                                        UNITED STATES MAGISTRATE JUDGE